

Villanova University School of Law Digital Repository

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-25-2006

# In Re: IT Grp Inc

Precedential or Non-Precedential: Precedential

Docket No. 05-2191

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"In Re: IT Grp Inc " (2006). *2006 Decisions.* Paper 990.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/990

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-2191
_____


IN RE:   IT GROUP, INC.,

Debtor


JOHN ACCARDI; DAVID L. BACKUS;
ROCHELLE BOOKSPAN; MELISSA L.DUBINSKY;
DENNIS G. FENN; JOHN P. FRANZ;
WILLIAM A. GAUNTT; THOMAS W. GRIMSHAW;
DAVID W. HICKMAN; WARREN C. HOUSEMAN;
STEPHEN C. KENNEY; JAMES R. MAHONEY;
THOMAS R. MARTI; DAVIDW. MAYFIELD;
WILLIAM H. MCINTOSH; ROY MCKINNEY;
DAVID C.MCMURTRY; DANIEL C. MELCHIOR, III;
GEORGEANN N. MOREKAS; WILLIAM C. PARIS;
MATTHEW G. RADEK; KEVIN R. SMITH;
LOUIS STOUT; LEONARD YAMAMOTO;
JOHN E. FOLEY; JAMES M. REDWINE;
STEWART BORNHOFT; ENZO ZORATTO;
POLLY QUICK,

Appellants
v.

IT LITIGATION TRUST; IT GROUP, INC.,
and their Affiliates, as employers and fiduciaries,
administrators and sponsors of the Plan;
CARLYLE PARTNERS II, LP, as fiduciary of the Plan
and/or tortfeasor; ANTHONY DELUCA;
FRANCIS J. HARVEY; HARRY J. SOOSE, as fiduciaries of
the Plan and as officers; IT CORPORATION DEFERRED
COMPENSATION PLAN EFFECTIVE JANUARY 1, 1996

MARK S. KENNEY,
Trustee

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 04-cv-00146)
District Judge: Honorable Joseph J. Farnan, Jr.

_____

Argued April 3, 2006
Before:  RENDELL, SMITH, and BECKER*, <u>Circuit Judges</u>

(Filed: May 25, 2006)

_____

_____

    *  The Honorable Edward R. Becker approved this
opinion but died before it was released.

2

John M. Stull
1300 North Market Street
P. O. Box 1947
Wilmington, DE  19899

Thomas A. Johnson [ARGUED]
Suite 201
33 West Mission Street
Santa Barbara, CA  93101

*Counsel for Appellants*
*John Accardi; David L. Backus; Rochelle Bookspan;*
*Melissa L. Dubinsky; Dennis G. Fenn; John P. Franz;*
*William A. Gauntt; Thomas W. Grimshaw;*
*David W. Hickman; Warren C. Houseman;*
*Stephen C. Kenney; James R. Mahoney;*
*Thomas R. Marti; David W. Mayfield;*
*William H. McIntosh; Roy McKinney;*
*David C. McMurtry; Daniel C. Melchior, III;*
*Georgeann N. Morekas; William C. Paris;*
*Matthew G. Radek; Kevin R. Smith; Louis Stout;*
*Leonard Yamamoto; John E. Foley;*
*James M. Redwine; Stewart Bornhoft;*
*Enzo Zoratto; Polly Quick*

Jeffrey M. Schlerf
The Bayard Firm
222 Delaware Avenue
P. O. Box 25130, 9th Floor
Wilmington, DE   19899

3

John K. Cunningham
Ileana A. Cruz
White & Case
200 South Biscayne Boulevard
Suite 4900
Miami, FL   33131

*Counsel for Appellees*
  *IT Litigation Trust; IT Group, Inc.,*
  *and Their Affiliates, As Employers and*
  *Fiduciaries, Administrators and Sponsors*
  *of the Plan*


Mark D. Collins
Jason M. Madron
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, DE   19899

Timothy L. Patten
Latham & Watkins
555  11th Street, N.W.
Suite 1000
Washington, DC  20004

*Counsel for Appellees*
  *Carlyle Partners II, LP, as Fiduciary of the*
  *Plan And/or Tortfeasor*

4

Ronald S. Gellert
Eckert, Seamans, Cherin & Mellott
1515 Market Street, Suite 900
Philadelphia, PA  19102

Mark A. Willard
Delia B. Bianchin
Sandra R. Mihok
Eckert, Seamans, Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, PA   15219

*Counsel for Appellee*
   *Anthony DeLuca*

Michael J. Prame [ARGUED]
Groom Law Group Chartered
1701 Pennsylvania Avenue, N.W.
Suite 1200
Washington, DC  20006

*Counsel for Appellee*
   *Francis J. Harvey*

5

Charles A. DeMonaco
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA  15222-5402

*Counsel for Appellee*
*Harry J. Soose, as Fiduciaries of the Plan*
*and as Officers*

_____

OPINION OF THE COURT
_____

RENDELL, <u>Circuit Judge</u>.

Plaintiffs (or "Participants"), participants in IT Corporation's Deferred Compensation Plan (the "Plan"), filed an adversary complaint in the Bankruptcy Court for the District of Delaware against IT Corporation (or the "Corporation"), its parent company, IT Group, Inc., and their subsidiaries, seeking secured, priority status for their claims for benefits owed to them under the Plan.  The Bankruptcy Court concluded that the Plan was an unfunded "top hat" plan under ERISA, and dismissed Participants' complaint.  The District Court for the District of Delaware affirmed.

6

On appeal, Participants contend that certain novel features of the Plan obligated the Corporation to fund a secular trust, outside the reach of creditors, for their exclusive benefit when the committee learned that the Corporation was facing insolvency.  We disagree, and will affirm.

## I.

### A.     Deferred Compensation Plans Generally

A deferred compensation plan "is an agreement by the employer to pay compensation to employees at a future date. The main purpose of the plan is to defer the payment of taxes."  David J. Cartano, *Taxation of Compensation & Benefits* § 20.01, at 709 (2004).  The idea is to defer the receipt of compensation until retirement or termination of employment, when the employee is in a lower tax bracket, thus reducing the overall amount of taxes paid.  *Id.* at § 20.02[A], at 710.

Certain deferred compensation plans, known as "top hat" plans, are subject to ERISA's administrative and enforcement provisions, but exempt from the substantive provisions that regulate plan funding and impose fiduciary

7

duties.[1]  Because the Participants' claims arise under ERISA's substantive provisions, *see* Pls.' 2d Am. Compl. at 29-37, they depend on a finding that the IT Group Deferred Compensation Plan is subject to ERISA's substantive protections, *i.e.*, that it is *not* a "top hat" plan.

> ERISA defines a top hat plan as:
>
> a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.

29 U.S.C. § 1051(2).  *See also* 29 U.S.C. §§ 1081(a)(3), 1101(a)(1).

---

[1]The Department of Labor has explained that Congress exempted "top hat" plans from ERISA's substantive protections because it believed that, unlike other employees, management and highly compensated employees have sufficient bargaining power to negotiate favorable deferred compensation plans and are capable of taking the risks attendant to such plans into account.  Dep't of Labor, Pension & Welfare Benefit Programs, Op. Ltr. 90-14A, 1990 ERISA LEXIS 12, at *3-4  (May 8, 1990).

When a plan is "unfunded,"

> [t]he employer promises to pay the employee the deferred compensation at a specified time, but does not set aside the funds in an escrow, trust fund, or otherwise. The assets used to pay the deferred compensation are the general assets of the employer and are subject to the claims of the employer's creditors.

*Cartano*, at § 20.02[A], at 721. The employee is not subject to tax on the compensation until he or she actually receives the deferred amount because "the employee may never receive the money if the company becomes insolvent." *Id.*

An employer may set aside deferred compensation amounts in a segregated fund or trust without jeopardizing a plan's "unfunded" status if the fund or trust remains "subject to the claims of the employer's creditors in the event of insolvency or bankruptcy." *Id.* at § 20.05[D], at 731.

One commonly-used mechanism is the "rabbi trust," which is

> an irrevocable trust for deferred compensation. Funds held by the trust are out of reach of the employer, but are subject to the claims of the

9

employer's creditors in the event of bankruptcy or insolvency.

The rabbi trust gives employees some measure of security, while at the same time deferring taxes. The assets set aside in the trust are segregated from the employer's other assets and can be used only to pay the deferred compensation. If there is a change in control of the company, the new owners cannot take back the assets of the trust.

The employee is not taxed until receipt of benefits as long as the trust funds are subject to the claims of the employer's creditors. The employer is treated as the owner of the funds and taxed on all fund earnings until the date of distribution.

*Id.* at § 20.05[D][3], at 735. The Department of Labor has opined that "a plan will not fail to be 'unfunded' . . . solely because there is maintained in connection with such plan a 'rabbi trust.'" Dep't of Labor, Pension & Welfare Benefit Programs, Op. Ltr. 91-16A, 1991 ERISA LEXIS 16, at *6-7 (Apr. 5, 1991).

**B.     IT Corporation's Deferred Compensation Plan**

IT Corporation adopted the Plan in January of 1996. Participation in the Plan was limited to "non-employee directors and to employees . . . who are part of a select group of management or highly compensated employees."  Plan ¶ 2.1.  The Plan document specifies that it "constitutes an unfunded plan," that participants in the Plan have "no legal or equitable right, interest or claim in any property or assets of" the Corporation or its affiliates and that the Corporation's obligation under the Plan is "merely that of an unfunded and unsecured promise to pay money in the future."  Plan ¶ 13.1. The Plan is administered by a committee established by the Corporation's President and Chief Executive Officer.  Plan ¶ 10.1.

IT Corporation agreed to establish a trust in connection with the Plan, Plan ¶ 1.28, and to "transfer over to the Trust such assets, if any, as the Committee determines, from time to time and in its sole discretion, are appropriate," Plan ¶ 12.1. At the same time that it adopted the Plan, the Corporation adopted a "Master Trust Agreement for Deferred Compensation Plans."  The Trust Agreement provided that assets contributed to the Trust were to be held "subject to the claims of the Company's and the Subsidiaries' creditors in the event of their Insolvency," and that the Trust would not "affect the status of the Plans as unfunded plans maintained for the purpose of providing supplemental compensation for a

select group of management, highly compensated employees and/or Directors for purposes of Title I of ERISA." Trust ¶ 1.2.

## C.  Procedural History

IT Group, IT Corporation and other affiliated subsidiaries filed for bankruptcy protection under Chapter 11 on January 16, 2002 in the Bankruptcy Court for the District of Delaware. On September 4, 2002, Participants filed the adversary complaint that began this proceeding. They named IT Group, all of its subsidiaries in bankruptcy, various former executive officers of IT Group and Carlyle Partners II, LP, a major shareholder of IT Group, as defendants. Participants claimed that the Plan did not qualify for "unfunded," "top hat" status under ERISA, and was thus subject to ERISA's funding and fiduciary duty requirements. Under this theory, Participants contend that IT Corporation had a duty to set aside, in a trust for Participants' exclusive benefit, *i.e.*, beyond the reach of the Corporation's creditors, assets sufficient to satisfy the Corporation's obligations under the Plan. The executive and shareholder defendants, correspondingly, owed Participants fiduciary duties under ERISA to ensure that the trust was funded before the bankruptcy petition date.[2]

---

[2]Participants also set forth state law causes of action in their complaint, *see* 2d Am. Compl. at 37-47, App. at 257-267, but do not appeal the dismissal of those claims.

12

Participants' complaint relied principally on the Plan and Trust documents, but also alleged that a former President and CEO of IT Corporation orally promised a senior officer and other potential Plan participants that the Corporation would fund the Trust for the exclusive benefit of plan participants and ensure that benefits would be paid in full if the Corporation ever faced the prospect of insolvency or bankruptcy. 2d Am. Compl. at 8.

The defendants filed, and the Bankruptcy Court granted, a consolidated motion to dismiss Participants' claims. The Court found that the Plan was "unfunded" and offered only to a "select group of management or highly compensated employees," and was, thus, a top hat plan exempt from ERISA's substantive protections. Participants appealed to the District Court for the District of Delaware; the District Court affirmed.

## II.

The District Court had jurisdiction to hear Participants' appeal from the Bankruptcy Court's final order dismissing their adversary complaint pursuant to 28 U.S.C. § 158(a); our jurisdiction over the appeal from the District Court's order arises under 28 U.S.C. § 158(d).

On appeal, "we stand in the shoes of the district court, applying a clearly erroneous standard to the bankruptcy

13

court's findings of fact and a plenary standard to that court's legal conclusions." *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). Because the District and Bankruptcy Courts dismissed Participants' complaint for failure to state a claim upon which relief could be granted, a purely legal question, we review their decisions *de novo*. *Id.*

In reviewing a motion to dismiss, we accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiffs. We may not dismiss a complaint for failure to state a claim upon which relief can be granted unless we find that the plaintiff can prove no set of facts that would entitle him to relief. *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 559 (3d Cir. 2002). We may consider documents that are attached to or submitted with the complaint and any legal arguments presented in the briefs and arguments of counsel. *Id.* at 360.

**III.**

The primary issue before us, as in the Bankruptcy and District Court proceedings, is whether the Plan qualifies for the top hat exemption from ERISA's substantive provisions. Because Participants do not challenge those courts' determinations that the Plan was offered only to management and highly compensated employees, the only remaining question is whether the Plan was, in fact, "unfunded."

14

**A.**

ERISA does not specify, and we have not previously considered, what requirements a plan must meet in order to be considered "unfunded" for purposes of exemption from ERISA's substantive provisions.[3] However, the decisions of other courts of appeals provide useful guidance in this regard.

Other courts of appeals that have examined this issue have focused primarily on what are essentially two sides of the same coin: whether the corporation has set aside funds, separate from its general assets, for payment of plan benefits and whether the beneficiaries have a legal right greater than

---

[3]In previous cases involving deferred compensation plans offered to management and highly compensated employees, we have always assumed, without further examination, that ERISA's "top hat" exemption applies. *See, e.g.*, *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 435 (3d Cir. 2001) (considering the proper scope of judicial review of an administrator's decision to deny benefits owed under a top hat plan); *Senior Executive Benefit Plan Participants v. New Valley Corp.* (*In re New Valley Corp.*), 89 F.3d 143, 148 (3d Cir. 1996) ("Both plans at issue are top hat plans . . . ."); *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 284 (3d Cir. 1995) ("The dispute on appeal centers around [an] executive deferred compensation plan, which like all such plans is commonly referred to as a 'top hat' plan.").

that of a general, unsecured creditor to the corporation's assets.

The Eighth Circuit Court of Appeals has examined this issue from both sides. In considering whether a death benefit plan supported by a life insurance policy was subject to ERISA's substantive requirements, it stated that "[f]unding implies the existence of a res separate from the ordinary assets of the corporation." *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1214 (8th Cir. 1981). The plan was "funded" because the insurance policy provided "a res separate from the corporation" to which beneficiaries could look for payment of benefits under the plan. *Id.* On the other hand, an excess benefit plan that specified that the rights of the beneficiary under the plan would "be solely those of an unsecured creditor" was *un*funded, even though the employer had purchased an insurance policy to help it finance the plan, because the policy in that case "simply became a general, unpledged, unrestricted asset of the [employer] and those . . . assets in turn would be used to fund [the] plan." *Belsky v. First Nat'l Life Ins. Co.*, 818 F.2d 661, 663-64 (8th Cir. 1987).

Similarly, the Second Circuit Court of Appeals has observed that a plan under which benefits were to be paid "'solely from the general assets of the employer'" is unfunded. *Demery v. Extebank Deferred Compensation Plan*, 216 F.3d 283, 287 (2d Cir. 2000) (quoting *Gallione v.*

16

*Flaherty*, 70 F.3d 724, 725 (2d Cir. 1995)).  More recently, it adopted a standard first articulated in *Miller v. Heller*, 915 F. Supp. 651 (S.D.N.Y. 1996):

> the question a court must ask in determining whether a plan is unfunded is: "can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?"

*Demery*, 216 F.3d at 287 (quoting *Miller*, 915 F. Supp. at 660).  Applying this test, the court found that a deferred compensation plan that was financed using life insurance contracts, the proceeds of which were kept in a separate account, was unfunded.  According to the court, the plan's terms did not "give plaintiffs a greater legal right to the funds in the Deferred Compensation Liability Account than that possessed by an unsecured creditor."  *Id.*  Although the account was separate, it was part of the "general assets" of the corporation, and the plan was therefore "unfunded as a matter of law."  *Id.*

The Fifth Circuit Court of Appeals employed a similar analysis, but also considered the tax treatment of the plan.  In *Reliable Home Health Care, Inc. v. Union Central Insurance Co.*, 295 F.3d 505 (5th Cir. 2002), it surveyed the decisions of

17

the other courts of appeals, and noted that the Department of Labor had provided the following guidance: "'[A]ny determination of the 'unfunded' status of an 'excess benefit' or 'top hat' plan of deferred compensation requires an examination of the facts and circumstances, including the status of the plan under non-ERISA law.'" *Id.* at 513 (quoting Dep't of Labor, Pension & Welfare Benefit Programs, Op. Ltr. 92-13A, 1992 ERISA LEXIS 14, at *7 (May 19, 1992)). More specifically, the court emphasized DOL's advice that the tax consequences of the plan should be considered in the analysis, *id.* (citing DOL Op. Ltr. 92-13A, 1992 ERISA LEXIS 14, at *7), and noted a district court's holding that "a 'plan is more likely than not to be regarded as unfunded if the beneficiaries under the plan do not incur tax liability during the year that the contributions to the plan are made,'" *id.* at 514 (quoting *Miller*, 915 F. Supp. at 659). Combining all of this information, the court devised the following test:

> in determining whether a plan is "funded" or "unfunded" under ERISA, a court must first look to the surrounding facts and circumstances, including the status of the plan under non-ERISA law. Second, a court should identify whether a [plan] is funded by a res separate from the general assets of the company.

*Id.*

18

The *Reliable* court concluded, under this test, that a death benefit plan was unfunded. Like the plans at issue in *Demery* and *Belsky*, the plan was financed through the purchase of life insurance contracts on behalf of participating employees. However, those contracts belonged to the company, not the participating employees. Plan participants were prohibited from contributing to the plan, and did not treat the company's contributions to the plan on their behalf as taxable income. Thus, the plan was unfunded and exempt from ERISA's substantive provisions. *Id.* at 514-15.

We agree with our fellow courts of appeals that the keys to the determination of whether a plan is "funded" or "unfunded" under ERISA are (1) whether beneficiaries of the plan can look to a res separate from the general assets of the corporation to satisfy their claims; (2) whether beneficiaries of the plan have a legal right greater than that of general, unsecured creditors to the assets of the corporation or to some specific subset of corporate assets. We may also consider the plan's intended and actual tax treatment.[4] We will analyze the

---

[4]As noted above, a plan under which the beneficiaries do not incur tax liability during the year that the contributions to the plan are made is "more likely than not" an "unfunded" plan. *Miller v. Heller*, 915 F. Supp. 651, 659 (S.D.N.Y. 1996). This is so because the tests for taxation of deferred compensation and for funding status overlap–deferred compensation is not taxable as current income only where the future payment of the compensation is somehow uncertain, *i.e.*, where the assets used

19

IT Corporation Plan accordingly.

## B.

The IT Corporation Plan is an unfunded top hat plan under ERISA.  At the outset, we note that the Plan and Trust documents express, in no uncertain terms, IT Corporation's intent to create an unfunded plan.  The "Purpose" section of the Plan document provides that the "Plan constitutes an unfunded plan."  And the Trust document explicitly states that the Trust "shall not affect the status of the Plans as unfunded plans . . . for purposes of Title I of ERISA."  Trust ¶ 1.2.

Beyond the Corporation's stated intent, an examination of the factors set forth above fully supports our conclusion. First, there is no res separate from IT Corporation's general assets to which Participants can look to satisfy their claims. Although the Plan document provides for, and the Trust document establishes, a "Trust" for participants' benefit, no funds were ever deposited into the Trust.  And Participants'

_____

to pay participants' claims are also subject to other creditors' claims.  Thus, the fact that a plan qualifies for deferred tax treatment strongly supports the conclusion that it was unfunded. *See* Dep't of Labor, Pension & Welfare Benefit Programs, Op. Ltr. 92-13A, 1992 ERISA LEXIS 14, at \*7 (May 19, 1992) (noting that "the tax consequences to trust beneficiaries should be accorded significant weight" in determining whether a plan is "funded" or "unfunded").

"account balances," listed on their annual benefit statements, do not reflect actual deposits held in a particular location; the Plan specifically states that each balance is a "bookkeeping entry only," designed to "be utilized solely as a device for the measurement and determination of amounts to be paid to or in respect of a Participant pursuant to the Plan." Plan ¶ 1.2.

Second, even if the Trust were funded, Participants' legal rights to its assets, and to the assets of the Corporation as a whole, are no greater than those of the Corporation's general, unsecured creditors. The Deferred Compensation Plan Questions & Answers, which was circulated to potential participants along with the Plan document, explains that the Trust is a "'Rabbi Trust'" that "does not provide security in the event that IT Corporation or its subsidiaries become insolvent or file for bankruptcy."[5] Moreover, the Trust document unequivocally establishes that Trust assets are subject to creditors' claims in the event of insolvency, and that such claims are on par with those of Plan participants. *See, e.g.*, Trust ¶ 1.3 ("The Participants and their

---

[5]As noted above, the DOL has opined that a "rabbi trust" maintained in connection with a deferred compensation plan will not undermine the plan's "unfunded" status. *See* Dep't of Labor, Pension & Welfare Benefit Programs, Op. Ltr. 91-16A , 1991 ERISA LEXIS 16, at *6-7 (Apr. 5, 1991).

21

Beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust. . . . Any assets held by the Trust will be subject to the claims of the Company's and the Subsidiaries' general creditors under federal and state law in the event of Insolvency . . . ."); Trust ¶ 3.6(a) ("To the extent that any Participant or Beneficiary acquires the right to receive payments under any of the Plans, such right shall be no greater than that of an unsecured general creditor of the Company and the Subsidiaries and such Participant or Beneficiary shall have only the unsecured promise of the Company and the Subsidiaries that such payments shall be made.").

The Plan document similarly limits Participants' legal rights to IT Corporation's general corporate assets. *E.g.*, Plan ¶ 13.1 ("Participants . . . shall have no legal or equitable right, interest or claim in any property or assets of an Employer. . . . An Employer's obligation under the Plan shall be merely that of an unfunded and unsecured promise to pay money in the future.").

Finally, we note that Participants did not pay taxes on

22

the compensation that they deferred under the Plan.[6]

Participants do not mount much of a challenge to any of the foregoing (aside from our consideration of the tax treatment of the Plan, *see supra* note 6). Instead, they argue that this analysis fails to take into account *other* facts and circumstances that render the Plan "funded." Participants advance two arguments in this regard. We address each theory in turn.

## C.

The "centerpiece" of Participants' claim, *see* Appellants' Br. at 22, is that the Plan document obligated the Plan's administrative committee to create and fund a secular trust for their exclusive benefit in the event of impending insolvency. More specifically, they argue: (1) that paragraph

---

[6]Participants argue that the tax treatment of the Plan is "irrelevant." Although they acknowledge that they did not report deferred compensation as income for tax purposes, they contend that the Plan as drafted "was *never* entitled to favorable tax treatment" because of the administrative committee's alleged obligation to fund an exclusive benefit trust on their behalf in the event of insolvency. Appellants' Br. at 38. Given that Participants benefitted from this tax treatment when the Corporation was solvent, their argument seems more than a little disingenuous. Moreover, as we discuss in Section III.C below, we reject Participants' characterization of the Plan.

12.1 of the Plan document,[7] which gives the Plan's administrative committee "sole discretion" over the funding decisions related to the Plan, implies a duty to actually fund the Trust in "good faith"; (2) that the duty of good faith carries an obligation to avoid forfeitures, which, in this case, could only have been accomplished by funding an exclusive benefit trust before the Corporation became insolvent; and (3) that the Corporation "pre-approved," in the Trust document, an amendment to the Trust that would convert it from a "rabbi trust," susceptible to general creditors' claims, into a secular trust for the exclusive benefit of Plan participants. Thus, Participants conclude, they have a legal right to payment of Plan benefits greater than that of the Corporation's general, unsecured creditors.

We need not dwell on this argument for long, because we reject its fundamental premise. Although we have recognized that terms of top hat plans that confer discretion to plan administrators are subject to the implied duty of good faith, *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 448 (3d Cir. 2001), that duty does not extend as far as Participants

---

[7]The full text of paragraph 12.1 is as follows:

> The Employers shall establish the Trust and shall transfer over to the Trust such assets, if any, as the Committee determines, from time to time and in its sole discretion, are appropriate.

24

contend. The implied duty of good faith is merely an
"interpretive tool to determine the parties' justifiable
expectations," *Northview Motors, Inc. v. Chrysler Motors
Corp.*, 227 F.3d 78, 91 (3d Cir. 2000); it may not be used to
add new terms to an agreement, *Lorenz v. CSX Corp.*, 1 F.3d
1406, 1415 (3d Cir. 1993), or to override express contractual
terms, *Northview*, 227 F.3d at 91. For Participants to succeed,
we would have to do just that–to hold that the duty requires
the Plan's administrative committee to fund a trust for their
exclusive benefit. This runs directly afoul of the Plan's stated
purpose to remain "unfunded" for ERISA purposes and its
express provision that Participants are not entitled to any
"legal or equitable right, interest or claim in any property or
assets of" the Company, and that the Company's obligation
under the Plan "shall be merely that of an unfunded and
unsecured promise to pay money in the future." Plan ¶ 13.1.

Participants urge that at least one court has used the
doctrine of "necessary implication" to imply an obligation to
fund an employee benefit plan that was not expressly
provided in the terms of the plan. *See Killian v. McCulloch*,
850 F. Supp. 1239, 1250-51 (E.D. Pa. 1994). However, that
doctrine is only employed to

> imply an agreement by the parties to a contract to
> do and perform those things that according to
> reason and justice they should do *in order to
> carry out the purpose for which the contract was*

25

*made* and *to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract*.

*Id.* (quoting *Somers v. Somers*, 419 Pa. Super. 131, 613 A.2d 1211, 1212 (1992)) (emphasis added). It does not apply where, as here, the implied agreement would not accomplish either of those goals, but would destroy, rather than carry out, the express purpose of the Plan. Here, the Committee, in failing to fund the trust, did nothing to destroy or injure Participants' rights under the Plan–the Plan granted them only a limited, unsecured right to future payment.

Participants would have us employ the implied duty of good faith and the doctrine of necessary implication to *expand* their rights under the Plan, not to "carry out the purpose" for which it was created. To accept Participants' argument would require us to depart significantly from our previous decisions regarding the scope of the implied duty of good faith, to broaden the doctrine of "necessary implication" and to disregard the plain and unambiguous language of the Plan and Trust documents. We cannot, and will not, do so.

## D.

Participants' second claim relies on parol evidence, in the form of an alleged oral representation made by the former President and CEO of IT Corporation to various Plan

26

participants, to establish that the plan was "funded." In their complaint, Participants alleged that the former President and CEO assured prospective participants that, in the event of insolvency, the Trust would be funded and they would be paid in full.

Participants argue, first, that terms of the Plan and Trust documents that give the Plan's administrative committee discretion to fund the Trust create ambiguity as to the Plan's intended funding status, and, second, that the alleged representation should be used to resolve that ambiguity. *See Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.)*, 89 F.3d 143, 150 (3d Cir. 1996) ("[O]nce a contract provision is found to be ambiguous, extrinsic evidence must be considered to clarify its meaning.").

We disagree. As discussed above, the terms of the Plan and Trust documents clearly and unambiguously evince the Corporation's intent to create an unfunded top hat plan. Moreover, as the Bankruptcy Court observed, the oral representation alleged by Participants "would add an additional term to the contract regarding funding; it would not shed light on the written terms of the Plan." *IT Group, Inc. v. Bookspan (In re IT Group, Inc.)*, 305 B.R. 402, 411 (Bankr. D. Del. 2004). Thus, the oral representation does not

27

undermine our initial conclusion that the Plan is unfunded, and has no place in our analysis.

## IV.

For the foregoing reasons, we agree with the Bankruptcy and District Courts that Participants' claims should be dismissed. We will accordingly AFFIRM the District Court's order.